UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------

HECTOR FERNANDEZ,

                    Plaintiff,

           v.

WOODHULL MEDICAL AND MENTAL
HEALTH CENTER, NORTH BROOKLYN
HEALTH NETWORK and NEW YORK CITY
HEALTH & HOSPITALS CORPORATION,

                    Defendants.

---------------------------------------------------------------

**<u>MEMORANDUM & ORDER</u>**
14-CV-4191 (MKB)

MARGO K. BRODIE, United States District Judge:

      Plaintiff Hector Fernandez commenced the above-captioned action on July 8, 2014,

against Defendants Woodhull Medical and Mental Health Center ("Woodhull"), North Brooklyn

Health Network and the New York City Health & Hospitals Corporation ("HHC"), alleging that

Defendants violated the Family and Medical Leave Act, 29 U.S.C. § 2610, *et seq.* ("FMLA") and

New York State Labor Law sections 740 and 741 when they demoted and terminated his

employment in retaliation for his complaints and for exercising his rights under the FMLA.

(Compl., Docket Entry No. 1.)  Defendants move for summary judgment pursuant to Rule 56 of

the Federal Rules of Civil Procedure.  (Defs. Mot. for Summ. J. ("Defs. Mot."), Docket Entry

No. 53; Decl. of Donna Canfield in Supp. of Defs. Mot. ("Canfield Decl."), Docket Entry No.

54; Defs. Statement of Undisputed Facts Pursuant to Local R. 56.1 ("Defs. 56.1"), Docket Entry

No. 55; Defs. Mem. in Supp. of Defs. Mot. ("Defs. Mem."), Docket Entry No. 59.)  For the

reasons set forth below, the Court grants Defendants' motion for summary judgment.

## I. Background

The following facts are undisputed except as otherwise noted. Plaintiff was hired by HHC on April 24, 1989 as the Coordinating Manager B for an HIV initiative. (Defs. 56.1 ¶ 3.) Between 1989 and 2009, Plaintiff was promoted three times and was reassigned twice. (*Id.* ¶¶ 5–10.)

### a. Plaintiff's employment at Woodhull

On June 1, 2009, Plaintiff was reassigned from Cumberland Diagnostic and Treatment Center ("Cumberland") to Woodhull following an altercation with a colleague at Cumberland. (*Id.* ¶¶ 10–11.) Plaintiff oversaw the Dental Clinic at Woodhull and, for his first two performance evaluations, received "fully competent" ratings. (*Id.* ¶¶ 13–14.) In or around March of 2011, Plaintiff's supervisor retired and was replaced by Matrid Harper, who assumed the title of Senior Associate Director of Ambulatory Care at Woodhull. (*Id.* ¶ 15.)

In July of 2011, Harper conducted a three-month performance evaluation of Plaintiff. (*Id.* ¶ 16.) Although Plaintiff received an overall performance rating of "fully competent," Harper rated Plaintiff as "needs improvement" in several performance areas. (*Id.*) Harper noted that Plaintiff needed to assess and improve the patient scheduling system, needed to prepare routine reports at the end of each month, had a higher than acceptable number of complaints from patients regarding their satisfaction, and needed to be mindful of the manner in which he spoke to his subordinates and colleagues so as not to be perceived as insensitive and intimidating.[1] (*Id.* ¶ 17.) Plaintiff disagreed with Harper's evaluation and told Harper, among

---

[1] In June of 2011, during the three-month period during which Harper assessed Plaintiff for his performance evaluation, at least three patient complaints were lodged against the Dental Clinic, which Plaintiff oversaw, or against Plaintiff himself. (Defs. 56.1 ¶¶ 21–23.)

other things, that she should "familiarize herself with the service" before she began assessing her subordinates. (*Id.* ¶¶ 18–20.) Plaintiff refused to sign his evaluation and told Harper that he would like to meet with the Senior Associate Executive Director, Vincent Mulvihill, who was responsible for all of the Ambulatory Care at Woodhull. (*Id.* ¶ 29.)

On July 1, 2011, Plaintiff and Harper received notice of a complaint against the Dental Clinic that suggested Plaintiff had acted unprofessionally. (*Id.* ¶ 32.) Harper directed Plaintiff to respond to the complaint by July 6, 2011, but Plaintiff did not. (*Id.* ¶ 33.) After receiving three reminders and again being directed to respond by the close of business on July 14, 2011, Plaintiff responded to the complaint. (*Id.*) Similar complaints were lodged against Plaintiff on July 25, 2011 and August 9, 2011. (*Id.* ¶¶ 34–35.) At a practice-wide meeting on October 19, 2011, clinical staff complained that Plaintiff was reviewing clinical charts and overstepping his role as administrator of the dental practice.[2] (*Id.* ¶ 36.) Also at the October 19, 2011 meeting, dental residents expressed that dental assistants were fearful of Plaintiff, and the team agreed that they would convene a separate meeting to address this fear. (*Id.* ¶ 39.)

On December 12, 2011, a patient complained to the Patient Relations Department that Plaintiff had been dismissive and rude to her. (*Id.* ¶ 40.) In or around December of 2011, the head nurse of oral surgery, Lillian Lozada, filed a complaint that Plaintiff was "creating a hostile work environment" because he had told her she was "playing with fire" and had alluded that he had the power to terminate her employment or have her transferred. (*Id.* ¶ 41.) Plaintiff states that Lozada made the complaint in retaliation for Plaintiff "exposing her dangerous practices."

---

[2] In general, the parties appear to dispute whether Plaintiff's role as administrator of the dental practice entitled him to make decisions about or interfere in specific clinical or direct patient care issues. (*See* Defs. 56.1 ¶¶ 36–38; Pl. Counter-Statement of Undisputed Facts Pursuant to Local R. 56.1 ("Pl. 56.1") ¶¶ 36–38, Docket Entry No. 62.)

(Pl. Counter-Statement of Undisputed Facts Pursuant to Local R. 56.1 ("Pl. 56.1") ¶ 41, Docket Entry No. 62.)

On April 17, 2012, Plaintiff sent Harper an email stating that he had been informed that Harper was concerned about his "absences and [his] job performance." (Defs. 56.1 ¶ 42.) Plaintiff continued: "In [y]our supervision you have never indicated nor discussed any concerns with regard to my job performance or concern with my absences. We need to discuss since this is creating a hostile work environment." (*Id.*) Between July 1, 2011 and April 16, 2012, Plaintiff had ten days of unscheduled annual leave and nine days of unscheduled sick leave, and between July 1, 2011 and June 30, 2012, Plaintiff had fourteen days of unscheduled annual leave and thirteen days of unscheduled sick leave. (*Id.* ¶¶ 43–44.) Between July of 2011 and June of 2012, Harper rated Plaintiff as "fully competent" overall on his performance evaluation, but noted under "suggestions and plans for improvement" that Plaintiff should "strive to the degree possible to reduce the number of unscheduled absences during the next evaluation period." (*Id.* ¶ 46.)

Plaintiff alleges that between June of 2009 and his termination on December 9, 2013, he observed and reported to his supervisors many violations of federal, state and independent regulations, including failure to document and record patient information, loss and misappropriation of medical equipment, improper disposal of patient records, missing or incomplete lab work, and submission of inaccurate bills to Medicare. (*Id.* ¶ 47; Compl. ¶¶ 17, 23–24, 26–27, 31–34, 37, 39–40.) Plaintiff first complained "back in 2011 or 2012" to Mulvihill and Harper that dental residents were disposing of patient charts and x-rays in the "confidential bin," which Plaintiff states is not the process for destroying confidential patient or medical records. (Defs. 56.1 ¶ 48.) After Plaintiff complained, the Dental Clinic undertook a review and

concluded that the existing practice was not improper, but Plaintiff continued to believe the disposal practices were improper. (*Id.* ¶ 52; Pl. 56.1 ¶ 52.) In response to Plaintiff's complaints, however, everyone in the dental practice was trained in the process of maintaining and storing medical records. (Defs. 56.1 ¶ 55.)

Plaintiff also complained to Mulvihill and Harper in or around October of 2011 that medical clinicians were not completing documentation in a timely manner.[3] (*Id.* ¶ 58.) Mulvihill spoke to the relevant doctors about Plaintiff's allegations and determined that the allegations were unsubstantiated. (*Id.* ¶¶ 63–66.) On December 28, 2011, Plaintiff complained of the "systemic practice of charts lacking documentation for periods of more than two or three weeks post procedure." (*Id.* ¶ 67.) In particular, Plaintiff complained that Lozada had patients sign post-operative documentation before the procedure had been completed. (*Id.*) Following Plaintiff's reporting of the practice, Lozada's supervisors instructed her to immediately cease the practice and informed her that it was not hospital policy to allow patients to sign post-operative documentation before procedures. (*Id.* ¶ 68.) Plaintiff also complained in the fall or winter of 2011 that dental residents were systematically changing the stamp date on the computer to alter the dates on which clinical notes were taken. (*Id.* ¶ 69.) Upon investigating the allegations, Mulvihill determined that it was not possible to manually alter the stamp dates, but that residents had been copying and pasting notes on inpatient services when the course of treatment was the same. (*Id.* ¶ 71.) Mulvihill changed the system to eliminate the practice. (*Id.*)

---

[3] Defendants contend that the responsibility of ensuring timely clinical documentation belonged to two designated directors of the dental practice and not to Plaintiff, but Plaintiff disagrees. (Defs. 56.1 ¶ 58; Pl. 56.1 ¶ 58.) Plaintiff also disagrees with Defendants' assertion that Plaintiff, as an administrator, "had no purview or professional understanding or oversight of the clinical realm." (Defs. 56.1 ¶ 61; Pl. 56.1 ¶ 61.) Finally, Plaintiff disagrees with Defendants' assertion that he was not authorized to access medical records and chart documentation. (Defs. 56.1 ¶ 62; Pl. 56.1 ¶ 62.)

In addition, Plaintiff complained in the fall of 2011 that residents were falsely documenting that procedures had taken place when they had not, (*id.* ¶ 73), doctors were not properly documenting lab payments and purchases, (*id.* ¶ 74), vendors were overcharging the hospital, (*id.* ¶ 76), dental residents were taking tools home for use in their private practices and returning them later, (*id.* ¶ 79), doors were not remaining closed during dental procedures, (*id.* ¶ 81), instruments were being left out and transported from one area to another, (*id.* ¶ 82), and doctors were not reconciling patients' medication records or documenting patients' entire medical histories, which Plaintiff complained rendered Medicaid bills incomplete, (*id.* ¶¶ 83–91).

Sometime in the spring of 2013, Mulvihill and Harper met to discuss Plaintiff, and Harper told Mulyihill that she did not want to continue working with Plaintiff because of staff complaints about his conduct. (*Id.* ¶ 102.) Although Mulvihill had previously told Harper to have the staff put the allegations in writing so that he could send them to Human Resources, Harper informed him that the Dental Clinic staff was unwilling to commit anything to writing. (*Id.* ¶¶ 103–04.) Mulvihill subsequently met with Plaintiff and told him that "the staff has been complaining that you have been bullying them, that you are rude, [and] that you are creating a hostile work environment." (*Id.* ¶ 104.) Plaintiff responded, "Boss, look at me. I'm a big guy. People are intimidated not because I'm intimidating, it's by my appearance." (*Id.* ¶ 105.) Mulvihill told Plaintiff that he needed to "work with the staff" since "it's their perception and that's what you have to be mindful of." (*Id.*)

In May of 2013, Harper approached Mulvihill and informed him that the dental staff wanted to meet with him to discuss Plaintiff. (*Id.* ¶ 106.) Mulvihill met with approximately fifteen members of the dental staff at the Dental Clinic on May 24, 2013. (*Id.*) According to Defendants, all but one dental staff member had a story that Plaintiff had bullied or threatened

him or her. (*Id.* ¶ 107.) After meeting with the dental staff, Mulvihill met with Human Resources and expressed that although the dental staff was unhappy with Plaintiff, none of them was willing to put their complaints in writing. (*Id.* ¶ 110.)

At the advice of Human Resources, by memorandum dated May 28, 2013, Mulvihill notified Plaintiff that Plaintiff was being reassigned to the Williamsburg Community Health Center ("Williamsburg") effective June 3, 2013. (*Id.* ¶ 100.) According to Defendants, the decision to reassign Plaintiff specifically to Williamsburg, was made because the Associate Director position at Williamsburg was comparable to Plaintiff's position at Woodhull. (*Id.* ¶ 113.) Plaintiff disputes this, stating that the position at Williamsburg "entailed supervision of a much smaller staff." (Pl. 56.1 ¶ 113.) Plaintiff met with Mulvihill the day he received the memorandum and does not recall the specifics of the meeting, other than the fact that the staff had alleged he was "difficult to work with." (Defs. 56.1 ¶ 101.) Plaintiff does not dispute, however, that Mulvihill told Plaintiff he was being reassigned because:

> The staff, all of them with the exception of one have come forward and said that you're bullying them, that you've been rude, that you've been condescending, you have been intimidating, and whether you believe it or not, it's the perception of the staff. So you have to watch this behavior. You have to be careful how you present yourself. A good administrator should be motivating staff, not bullying them or threatening them.

(*Id.* ¶ 116.)

Also in May of 2013, Mulvihill met with both Harper and Maire Kavanagh, the Senior Associate Director of Ambulatory Care at Williamsburg, to advise them of Plaintiff's transfer and to instruct them to remain in communication regarding Plaintiff's job performance. (*Id.* ¶ 114.) In speaking with Plaintiff about the reassignment in May of 2013, Mulvihill also instructed Plaintiff to work with Kavanagh at Williamsburg and instructed Kavanagh to "work with [Plaintiff] and document his progress or issues" and to "be clear about what responsibilities

she was assigning him and what the deadlines were to be." (*Id.* ¶ 118.)  Mulvihill did not discuss Plaintiff's prior performance at Woodhull.  (*Id.*)  Mulvihill told Plaintiff to remember their prior conversation about perception and to look at the transfer as an opportunity, since Plaintiff was moving from overseeing the Dental Clinic to overseeing an entire building that provided medical, pediatric and women's health.  (*Id.* ¶ 115.)  Plaintiff was upset about the reassignment. (*Id.* ¶ 116.)

After Plaintiff was notified that he would be transferred to Williamsburg, Mulvihill received a letter dated May 30, 2013 signed by some members of the Dental Clinic staff expressing their desire that Plaintiff remain as "manager of Dental." (*Id.* ¶ 120.)  Mulvihill was "shocked" by the letter, since all but one of the staff members that he met with had expressed serious concerns about Plaintiff and the letter contradicted those statements.  (*Id.* ¶ 121.) Mulvihill noticed that Lozada, who had previously filed a hostile work environment complaint against Plaintiff, had not signed the letter but had instead stamped it.  (*Id.* ¶ 122.)  Mulvihill asked Lozada whether she had stamped her name, and she told him that "she did not want to sign, there were some people that were forcing everybody to sign, and she did not want to sign, so they forced her just to stamp [the letter]." (*Id.* ¶ 123.)  Mulvihill believes that some members of the dental staff were coerced to sign the letter.  (*Id.* ¶ 125.)  Notwithstanding this, by the time Mulvihill received the letter, Plaintiff had already been reassigned to Williamsburg.  (*Id.* ¶ 126.)

### b.  Plaintiff's FMLA leave and employment at Williamsburg

Plaintiff was approved for and took paid FMLA leave from June 1, 2013 to June 15, 2013.  (*Id.* ¶ 128.)  As a result, Plaintiff had exhausted the twelve weeks of leave permitted under the FMLA.  (*Id.*)  From June 16, 2013 to July 21, 2013, Plaintiff was out of work on medical, non-FMLA leave.  (*Id.* ¶ 133.)  Plaintiff had previously discussed the condition underlying his

FMLA leave with Mulvihill, who did not inquire any further.  (*Id.* ¶ 132.)

On or about June 17, 2013, Plaintiff sent an email to Michelle Emmons, Senior Associate Executive Director for Human Resources, with a copy to Mulvhill, stating that he was going to present evidence to the Office of the Inspector General [("OIG")] of current and past "fraudulent practices in the dental practice and the harassment that [Plaintiff] has had to endure as a result of pressuring the clinical administration and [Harper] for accountability."  (*Id.* ¶ 93.)  Plaintiff did not submit any evidence or ever register a complaint with the OIG during his employment.  (*Id.* ¶ 96.)

After returning from his FMLA and non-FMLA leave, and after he was reassigned to Williamsburg, Plaintiff and other associate directors attended a meeting with the new Chief Financial Officer of the organization.[4]  (*Id.* ¶ 129.)  During the meeting, Rick Walker, the recently hired CFO of Woodhull, discussed FMLA leave and stated, while looking at Plaintiff, "FMLAs are given here very easily."  (*Id.*)  Plaintiff felt that he was being singled out by Walker's comment.  (*Id.* ¶ 131.)

When Plaintiff reported to Williamsburg as a Practice Manager following his FMLA and non-FMLA sick leave in July of 2013, he told Kavanagh that he was not happy that he was reassigned to Williamsburg.  (*Id.* ¶ 135.)  After Plaintiff's reassignment, he met with Kavanagh weekly.  (*Id.* ¶ 140.)  It was Kavanagh's practice after the first six-to-eight weeks to reduce the meetings to biweekly if "things were going well" and the individual was not "struggling."  (*Id.*)

According to Kavanagh, "things did not go very well" for Plaintiff.  (*Id.*)  In late October and early November of 2013, Kavanagh became concerned with what she described as a "pattern of absenteeism" by Plaintiff and "a lack of consistency with submitting work on a timely basis."

---

[4]  The record does not indicate the date of the meeting.

(*Id.* ¶ 142.) Kavanagh discussed these concerns with Mulvihill, who told her to "keep an eye on it." (*Id.*) Mulvihill also told Kavanagh to work with Plaintiff and to coach him. (*Id.* ¶ 143.) Although Kavanagh requested that her managers inform her as early as possible if they were not going to be in their practice areas for a period of time so that she could make other accommodations, she asserts that Plaintiff refused to comply with her request. (*Id.* ¶¶ 144–45.) Plaintiff insists that he "regularly informed [] Kavanagh of his absences at the earliest opportunity." (Pl. 56.1 ¶ 145.)

On August 20, August 23, September 4, September 16, and October 16 of 2013, Plaintiff arrived late to Williamsburg and did not provide Kavanagh with advanced notice that he would be late or of his anticipated arrival time. (Defs. 56.1 ¶ 146.) This occurred despite the fact that on three of the five days, Plaintiff had a scheduled personal doctor's appointment. (*Id.*) According to Defendants, Plaintiff was tardy without notice, frequently and without explanation, which Plaintiff categorically denies.[5] (*Id.* ¶ 149; Pl. 56.1 ¶ 149.) Kavanagh eventually told Mulvihill that she felt Plaintiff was disrespectful because he left her to find coverage for Williamsburg without notice. (Defs. 56.1 ¶ 154.) Kavanagh received reports from other departments, such as Information Technology, Environmental Services and Labor Relations, that Plaintiff was difficult to work with, that he did not respect the boundaries and chain of command

_____

[5] Defendants identify specific instances in which Plaintiff's tardiness or absence created problems at Williamsburg — for example, Plaintiff did not inform Kavanagh that he had been called for several days of jury duty until the night before jury duty began, and he further did not inform her when jury duty was extended. (Defs. 56.1 ¶¶ 148, 150–51.) On another occasion, Plaintiff returned late from the Veterans' Day holiday weekend and informed Kavanagh two minutes prior to his scheduled 8:30 AM arrival time that he would arrive "no later than 1:00" PM. (*Id.* ¶¶ 152–53.) At 1:17 PM, Plaintiff emailed Kavanagh to state that he was "still on highway 95 coming from Albany" and would not be in by 1:00 PM. (*Id.*) Plaintiff does not dispute the specific instances of tardiness or absence but disputes Defendants' characterization of them "to the extent it suggests Plaintiff did not attempt to notify Defendants in the event he was late or absent." (Pl. 56.1 ¶¶ 148–50.)

when interacting with staff who were not his direct subordinates, and that he was disruptive, intimidating and unprepared. (*Id.* ¶¶ 155–58.) Plaintiff disputes the substance of these complaints but admits that they were made. (Pl. 56.1 ¶¶ 155–58.) Kavanagh identified specific problems with Plaintiff's performance at work and noted that Plaintiff was "defensive," "negative," and resistant to her feedback. (Defs. 56.1 ¶ 166.) Plaintiff disputes that his performance was substandard but admits that Kavanagh discussed these issues with him. (Pl. 56.1 ¶¶ 165–66.) Kavanagh believed Plaintiff demonstrated a lack of leadership and ownership of his responsibilities at Williamsburg, and, at Mulvihill's direction, Kavanagh submitted a memorandum requesting Plaintiff's termination. (Defs. 56.1 ¶ 170.)

On December 3, 2013, Kavanagh emailed Mulvihill a letter and documentation to support Plaintiff's termination. (*Id.* ¶ 171.) In response, Mulvihill requested that Kavanagh revise the first paragraph of the letter by removing the sentence, "[u]nfortunately [Plaintiff] had to go out on Medical leave so his reassignment date became July 22[,] 2013." (*Id.* ¶ 172.) Mulvihill made this recommendation because it "gives room for discrimination due to illness." (*Id.*) Mulvihill also directed Kavanagh to take out the sentence because:

> [I]f someone has FMLA, that is none of our business. We run our operations, it's predetermined that if [Human Resources] determines someone qualifies for FMLA, we have nothing to say in the matter, nor should we. So to bring it up in the context of this is inappropriate, and it could be perceived as discriminatory. We have no business arguing anything about [Plaintiff's] absenteeism due to an FMLA.

(*Id.* ¶ 173.) Kavanagh made the recommended change and submitted the termination request, after which Human Resources made the final determination based on, among other things, Kavanagh's reasoning. (*Id.* ¶¶ 174–76.) Prior to Plaintiff's termination, Irma Suarez, Senior Associate Executive Director of Human Resources, met with Kavanagh to discuss the difficulties Kavanagh was having with Plaintiff's performance. (*Id.* ¶ 178.) Suarez and the Senior Vice

President of Human Resources decided to terminate Plaintiff. (*Id.* ¶ 179.) Defendants state that Plaintiff was terminated "based on the written request submitted by Kavanagh, [P]laintiff's failure to improve his performance, and earlier problems [P]laintiff had while working in the dental clinic with Harper." (*Id.*) Harper had previously reached out to Suarez seeking Plaintiff's termination, but because Plaintiff was a long-term employee, Suarez and Human Resources decided to give Plaintiff a chance to improve at another location and transferred him to Williamsburg. (*Id.* ¶ 180.)

On December 9, 2013, Plaintiff was notified by letter of his termination. (*Id.* ¶ 181.) Plaintiff was provided ten business days to request a review of his termination, under the provisions of the HHC Operating Procedure. (*Id.* ¶ 182.) Plaintiff did not request a review of his termination until March 4, 2014, and, because the request was untimely, Defendants did not conduct a review of Plaintiff's termination. (*Id.* ¶¶ 183–84.)

## II.  Discussion

### a.  Standard of review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Davis v. Shah*, 821 F.3d 231, 243 (2d Cir. 2016); *see also Cortes v. MTA NYC Transit*, 802 F.3d 226, 230 (2d Cir. 2015). The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Rogoz v. City of Hartford*, 796 F.3d 236, 245 (2d Cir. 2015) (first quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010); and then citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the

plaintiff." *Anderson*, 477 U.S. at 252.  The "mere existence of a scintilla of evidence" is not

sufficient to defeat summary judgment.  *Id*.  The court's function is to decide "whether, after

resolving all ambiguities and drawing all inferences in favor of the nonmoving party, a rational

juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir.

2000).

### b.   FMLA retaliation claim

Defendants argue that Plaintiff cannot make out a prima facie case of retaliation under

the FMLA because the undisputed facts do not support an inference of retaliation where there is

no causal link between Plaintiff's FMLA leave and his transfer to Williamsburg and subsequent

termination.  (Defs. Mem. 3.)  Plaintiff alleges that Defendants "intentionally and methodically

forced [him] out of prestigious leadership and management roles" for exercising his rights under

the FMLA, and ultimately terminated him for the same reason.  (Compl. ¶ 52.)  Plaintiff argues

that the temporal proximity between his FMLA leave and his transfer and termination

sufficiently establishes Defendants' retaliatory intent.  (Pl. Mem. of Law in Opp'n to Def. Mot.

("Pl. Opp'n") 13, Docket Entry No. 61.)

"The FMLA gives eligible employees an 'entitlement' to twelve weeks per year of

unpaid leave '[b]ecause of a serious health condition that makes the employee unable to perform

the functions of the position of such employee.'" *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161,

174 (2d Cir. 2006) (quoting 29 U.S.C. § 2612(a)(1)(D)).  It "'creates a private right of action to

seek both equitable relief and money damages against any employer . . .' should that employer

'interfere with, restrain, or deny the exercise of' FMLA rights." *Id.* (quoting *Nev. Dept. of

Human Res. v. Hibbs*, 538 U.S. 721, 724–25 (2003)).  "The Second Circuit recognizes distinct

claims of interference and retaliation under the FMLA." *Sista*, 445 F.3d at 175; *see also Woods*

*v. START Treatment & Recovery Ctrs., Inc.*, --- F.3d ---, ---, 2017 WL 3044628, at *4 (2d Cir. July 19, 2017) ("FMLA claims come in at least two varieties: interference and retaliation." (citing *Potenza v. City of New York*, 365 F.3d 165, 167 (2d Cir. 2004))).  Retaliation claims "involve an employee actually exercising her rights or opposing perceived unlawful conduct under the FMLA and then being subject to some adverse employment action by the employer." *Woods*, --- F.3d at ---, 2017 WL 3044628, at *4.

In order to make out a prima facie case of FMLA retaliation, a plaintiff must establish that "(1) he exercised rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Potenza*, 365 F.3d at 168; *see also Turner v. Eastconn Reg'l Educ. Serv. Ctr.*, 588 F. App'x 41, 44 (2d Cir. 2014) (citing same); *Donnelly v. Greenburg Cent. Sch. Dist. No. 7*, 691 F.3d 134, 151 (2d Cir. 2012) (citing same).  The plaintiff "must demonstrate that [his] taking FMLA leave constituted 'a negative factor in [the defendant's] decision to terminate' him or her." *Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 207 (D. Conn. 2012) (citing *Sista*, 445 F.3d 176); *see also Hale v. Mann*, 219 F.3d 61, 68 (2d Cir. 2000) (holding that the FMLA "protects an employee from discharge or demotion by an employer if that action is motivated by the employee's taking leave pursuant to the FMLA").

FMLA retaliation claims are examined under the burden-shifting framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973).[6]  *Sista*, 445 F.3d at 176 (applying

---

[6]  The Second Circuit has analyzed FMLA retaliation claims under the *McDonnell Douglas* burden-shifting framework without ever explicitly holding that the burden-shifting framework applies to every FMLA retaliation claim.  *See, e.g.*, *Graziado v. Culinary Inst. of Am.*, 817 F.3d 415, 429 n.7 (2d Cir. 2016) ("We employ the *McDonnell Douglas* test because a) the

*McDonnell Douglas* to FMLA retaliation claim).  Under that framework, a plaintiff must first

establish a prima facie case of discrimination.  *Graziado v. Culinary Inst. of Am.*, 817 F.3d 415,

429 (2d Cir. 2016).  A plaintiff's burden at this stage is "minimal."  *Holcomb v. Iona Coll.*, 521

F.3d 130, 139 (2d Cir. 2008) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993)).

If a plaintiff meets her burden at this stage, the burden shifts to the defendant-employer to

"demonstrate a legitimate, non-discriminatory reason for its actions."  *Graziado*, 817 F.3d at

429; *see also Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 84 (2d Cir. 2015).  If the

defendant-employer articulates such a reason, the burden shifts back to the plaintiff-employee to

show that the defendant-employer's reason was pretext.  *Graziado*, 817 F.3d at 429; *see also*

*Sista*, 445 F.3d at 169 ("A plaintiff must establish a prima facie case; the employer must offer

through the introduction of admissible evidence a legitimate non-discriminatory reason for the

discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that

the proffered reason is a pretext.").

### i.  Plaintiff states a prima facie claim for retaliation

The first three elements of Plaintiff's FMLA retaliation are undisputed.  (Defs. Mem. 2;

Pl. Opp'n 11.)  Plaintiff exercised his rights under the FMLA when he took FMLA leave from

March until May of 2013 and again in June of 2013, (Defs. 56.1 ¶ 128); and Defendant does not

dispute that Plaintiff was qualified for his position or that the transfer to Williamsburg and

---

district court and both parties assumed its application, b) *Potenza* [*v. City of New York*, 365 F.3d
165, 167 (2d Cir. 2004)] indicated that it should be applied in FMLA cases, and c) most of our
sister circuits have applied it in FMLA cases. . . . Since we find that [the plaintiff] meets the
stricter *McDonnell Douglas* test, we need not decide today whether an easier test would govern."
(collecting cases)); *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*, 691 F.3d 134, 152 (2d Cir.
2012) ("We have never definitively applied the burden-shifting framework from the context of
employment discrimination to FMLA retaliation, and we need not establish that application here
. . . ."); *Thomsen v. Stantec, Inc.*, 483 F. App'x 620, 622 (2d Cir. 2012) (applying *McDonnell
Douglas* to FMLA retaliation claim).

Plaintiff's termination were adverse employment actions.  With respect to the fourth element, Defendants argue that Plaintiff has not stated a prima facie claim of retaliatory discharge because he has not established an inference of retaliatory intent either for his transfer to Williamsburg or his termination.  (Defs. Mem. 2–3.)  Plaintiff argues that "[t]he record is replete with evidence supporting the inference that [the transfer and the termination] were taken with retaliatory intent: (i) the temporal proximity between Plaintiff's FMLA leave and Defendants' adverse action, (ii) Defendants' hostility towards Plaintiff for missing work due to medical issues, (iii) Defendants' hostility towards the use of FMLA leave, and (iv) Defendants' reference to Plaintiff's FMLA leave in the first draft of a letter requesting Plaintiff's termination."  (Pl. Opp'n 11.)

     The Second Circuit has held that a causal connection in retaliation claims can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory actions directed against the plaintiff by the defendant." *Littlejohn v. City of New York*, 795 F.3d 297, 307, 319 (2d Cir. 2015) (quoting *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000)).  Thus, "[p]roof of the causal connection can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." *Colon v. Fashion Inst. of Tech.*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)); *see also, e.g.*, *Feingold v. New York*, 366 F.3d 138, 156–157 (2d Cir. 2004) ("[T]he requirement that [the plaintiff] show a causal connection between his complaints and his termination is satisfied by the temporal proximity between the two." (collecting cases)); *Nonnenmann v. City of New York*, 02-CV-10131, 2004 WL 1119648, at *22 (S.D.N.Y. May 20, 2004) ("Causation can be

established either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." (quoting *Morris v. Lindau*, 196 F.3d 102, 110 (2d Cir. 1999))).

Here, the Court finds that the timing of Plaintiff's initial FMLA leave and his transfer to Williamsburg may give rise to an inference of retaliatory intent as to his transfer. Plaintiff took FMLA leave from March 2, 2013 until May 6, 2013, and Defendants made the decision to transfer him to Williamsburg on May 28, 2013. (Defs. 56.1 ¶¶ 100, 128.) Courts frequently find a period of a few weeks sufficient to allow a jury to infer a causal connection between the protected act and the adverse employment action. *See, e.g.*, *Graziadio*, 817 F.3d at 431 (concluding that, among other things, the "very close temporal proximity" between employee's FMLA leave and her termination permitted the conclusion that the employer's decision was based on FMLA leave); *Littlejohn*, 795 F.3d at 319 (holding that the plaintiff had sufficiently pled facts to indirectly establish causation because "her demotion closely followed her protests of discrimination"); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 845 (2d Cir. 2013) ("The three-week period from [the plaintiff's] complaint to her termination is sufficiently short to make a prima facie showing of causation indirectly through temporal proximity."); *Donnelly*, 691 F.3d at 152 (holding that "the 'very close' temporal proximity required" to demonstrate retaliatory intent was present where, before the plaintiff's medical leave, his teaching evaluations were very positive and after his leave the evaluations deteriorated); *Feingold*, 366 F.3d at 156–57 (holding that there was an issue of fact as to retaliation causation where supervisors recommended terminating the plaintiff two weeks after his complaint); *Treglia v. Town of Manlius*, 313 F.3d 713, 721 (2d Cir. 2002) ("The temporal proximity between [plaintiff's] protected activity in February 1998 and the allegedly adverse employment actions in March 1998 is sufficient to

establish the required causal link for a prima facie case."); *Lovejoy–Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001) ("Although the plaintiff filed her complaint with the EEOC on February 4, 1994, the complaint was not served on [defendant] until the beginning of April 1994.  She was suspended later that month.  This time span is short enough to permit a jury to infer a causal connection."); *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (holding that there was a causal connection where the plaintiff was fired "just 20 days after GE learned that she had hired an attorney to pursue her claim of gender discrimination"); *Colon*, 983 F. Supp. 2d at 287 ("[T]he facts may give rise to an inference of retaliatory intent because of the timing of [the plaintiff's] notice to [the d]efendants of her intention to take FMLA leave, [was] followed very shortly by her suspension.").

The temporal proximity is more attenuated between Plaintiff's FMLA leave, which was exhausted by June 15, 2013, and his termination on December 9, 2013.  (*See* Defs. 56.1 ¶¶ 121, 181.)  Although the Second Circuit has noted that it "has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation," *Gorzynski v. JetBlue Airways Corporation*, 596 F.3d 93, 110 (2d Cir. 2010), courts have ordinarily found that a gap of nearly six months between FMLA leave and the adverse employment action is too long, on its own, to create an inference of retaliatory intent.

Plaintiff does not rely solely on temporal proximity to establish causation with respect to his termination.  Plaintiff argues that he has also identified other incidents from which a factfinder could infer that Defendants acted with retaliatory intent.  (Pl. Opp'n 14.)  The Court finds these additional incidents could not reasonably be construed to evince a retaliatory intent on Defendants' part.

Plaintiff argues that Harper did not want to work with him "because of his medical-related absences," (Pl. Opp'n 13), which began long before his FMLA leave, (*see* Defs. 56.1 ¶¶ 42–46). From that statement, Plaintiff argues that "an inference is established that [] Harper, who was displeased with [Plaintiff] for needing *any* time off work for medical reasons, was similarly displeased when [Plaintiff] applied for, received, and used several months of FMLA leave." (Pl. Opp'n 13.) Similarly, Plaintiff contends that Walker "looked" at Plaintiff in a meeting while stating, "FMLAs are given here very easily," which expressed a general hostility towards individuals who exercise their rights under the FMLA. (*Id.*) Plaintiff also argues that he was terminated because of Kavanagh's letter, the first draft of which "explicitly referred to Plaintiff's use of FMLA leave." (*Id.*) According to Plaintiff, this "negative" reference to Plaintiff's FMLA leave in a letter requesting his termination "is direct evidence that his use of FMLA leave played an impermissible role in her decision." (*Id.* at 14.)

First, there is no evidence that Harper's negative performance review of Plaintiff and her termination request were motivated by Plaintiff's use of FMLA leave; to the contrary, in her May 22, 2013 Interim Performance Report of Plaintiff after his return from FMLA leave, Harper observed that Plaintiff ignored "repeated efforts to have [] issues addressed and resolved," that "staff morale in the department is very low . . . evidenced by the number of staff complaints to me and labor relations with regard to [Plaintiff's] perceived 'bullying tactics' and favoritism to some employees,' that "multiple attempts to have monthly reports prepared to reflect the department's performance have been ignored," that Plaintiff "has not assumed a leadership role to ensure the updating of the department's policies," and that "there is a perceived communication difficulty with members of other departments." (*See* Defs. 56.1 ¶¶ 102–04; May

2013 Interim Performance Report, annexed to Decl. of Hector Fernandez ("Fernandez Decl.") as Ex. Z.)

Second, Walker's comment is the precise type of remark that the Second Circuit has characterized as "stray" and therefore not probative of intent. "[R]emarks made by someone other than the person who made the decision adversely affecting the plaintiff may have little tendency to show that the decision-maker was motivated by the discriminatory sentiment expressed in the remark." *Tomassi v. Insignia Fin. Grp., Inc.*, 478 F.3d 111, 115 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009); *see also Ostrowski v. Atl. Mut. Ins. Cos.*, 968 F.2d 171, 182 (2d Cir. 1992) (describing remarks as "stray" when made "in the workplace by persons who are not involved in the pertinent decisionmaking process"). "[T]he more remote and oblique the remarks are in relation to the employer's adverse action, the less they prove that the action was motivated by discrimination." *Tomassi*, 478 F.3d at 115. In determining whether a comment is a probative statement that evidences an intent to discriminate or whether it is a non-probative "stray remark," a court should consider the following factors:

> (1) who made the remark, i.e. a decisionmaker, a supervisor, or a low-level co-worker; (2) whether the remark was made in relation to the employment decision at issue; (3) the content of the remark, i.e., whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, i.e., whether it was related to the decisionmaking process.

*Wanamaker*, 899 F. Supp. 2d 193, 208 (quoting *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518–19 (S.D.N.Y. 2004)); *see also Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010) (applying the factors and noting that "[t]he district courts in this circuit have developed a standardized approach . . . [i]n determining whether a remark is probative . . . ." (citing, *inter alia*, *Schreiber*, 324 F. Supp. 2d at 518))).

Walker was the incoming CFO at Woodhull, and as such was not Plaintiff's supervisor. Walker's comment, in June of 2013, that FMLA leave was freely granted was made *after* Plaintiff's transfer to Williamsburg, and there is no evidence that Walker ever encountered Plaintiff again, that he had any role in the alleged adverse employment actions, or that anyone else present at the meeting understood him to be expressing dissatisfaction with FMLA leave generally, let alone in Plaintiff's case. *See Tomassi*, 478 F.3d at 115 ("The more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative that remark will be."); *Campbell v. All. Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000) ("Stray remarks by non-decision-makers or by decision-makers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision. (citation omitted)).

As to Plaintiff's argument that Kavanagh's draft letter is "direct evidence that [Plaintiff's] use of FMLA leave played an impermissible role in [Kavanagh's] decision," Plaintiff misunderstands the record. Kavanagh submitted to Mulvihill a three-page memorandum detailing Plaintiff's tardiness and unannounced failure to attend work, his poor relationships with other departments, his "[l]ack of [f]ollow-up," his failure to perform compliance audits, and his problems with his leadership. (*See* Kavanagh Letter dated Dec. 3, 2013, annexed to Canfield Decl. as Ex. MM.) In the introductory paragraph of that letter, Kavanagh initially wrote:

> Mr. Fernandez was reassigned as the Practice Manager to the Williamsburg community health practice as of June 4th 2013. Unfortunately Mr. Fernandez had to go out on Medical leave so his reassignment date became July 22nd 2013.
>
> In order to ensure Mr. Fernandez received a comprehensive orientation and training of daily[,] weekly and monthly responsibilities of a practice manager[,] Mr. Fernandez spent the first week of his reassignment with the previous practice manager Mr. Stephen Hurley being oriented to the practice and the

> responsibilities of a practice manager. In addition [b]imonthly *one on ones* were scheduled with his supervisor[.]

(*Id.*) It is not clear that Kavanagh was referencing or was even aware that part, but not all, of Plaintiff's leave was FMLA leave. Even if, as Plaintiff argues, Kavanagh's reference to Plaintiff's "medical leave" was a specific reference to Plaintiff's earlier FMLA leave, no reasonable juror would find that the language casts FMLA leave in a "negative light" or suggests that Plaintiff's FMLA leave was a factor in his termination; the reference to Plaintiff's medical leave seems to be prefatory language that sets forth the timeframe and context in which Kavanagh evaluated Plaintiff's work performance, simply explaining why, although reassigned at an earlier date, Plaintiff did not start working at Williamsburg until a much later date. Furthermore, there are no other references to Plaintiff's use of FMLA leave in the thirteen instances listed in Kavanagh's letter in which she references Plaintiff's tardiness or absence between August and December of 2013. As Defendants note, "by June 15, 2013 — a full month before Plaintiff went to Williamsburg — he had exhausted all the FMLA leave to which he was entitled," (Defs. Reply 4); thus, any medically-related absences or tardiness[7] that Kavanagh referenced in her letter as having taken place between July of 2013, when Plaintiff started at Williamsburg, and December of 2013, when Plaintiff was terminated, were not protected under the FMLA.

Because Plaintiff has not demonstrated that he was terminated under circumstances giving rise to an inference of retaliatory intent, he has not made out a prima facie case of retaliation as to his termination in December of 2013. *See Potenza*, 365 F.3d at 168.

---

[7] This assumes, for the sake of argument, that much of Plaintiff's "absenteeism" as identified in Kavanagh's letter was attributable to his medical condition, which is not apparent from the face of the letter itself but is implied in Plaintiff's argument that by challenging his absences, Defendants challenged his FMLA leave. (*See* Kavanagh Letter dated Dec. 3, 2013.)

Nevertheless, the Court finds that Plaintiff has made out a prima facie case of retaliation as to his transfer to Williamsburg, based on temporal proximity alone. The Court therefore considers whether Defendants have demonstrated a legitimate, non-discriminatory reason for transferring Plaintiff to Williamsburg. *See Graziado*, 817 F.3d at 429 (applying the *McDonnell Douglas* framework to FMLA retaliation claim); *Thomsen*, 483 F. App'x at 623 (same).

### ii. Defendants have provided a legitimate, non-discriminatory reason for transferring Plaintiff

Defendants argue that Plaintiff's work performance and repeated complaints from his colleagues and staff prompted them to transfer him to Williamsburg. (Defs. Mem. 4.) Plaintiff argues that any difficulties he experienced were "actually discriminatory" because they resulted from Plaintiff's efforts to "correct regulatory violations that put patient health and safety at risk." (Pl. Opp'n 15.)

"Once the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action." *Kwan*, 737 F.3d at 845 (citing *United States v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011)). An employer's "explanation of its reasons must be clear and specific" in order to "afford the employee a full and fair opportunity to demonstrate pretext." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 105 (2d Cir. 2001) (citation omitted). "Where an employer's explanation, offered in clear and specific terms, 'is reasonably attributable to an honest even though partially subjective evaluation of qualifications, no inference of discrimination can be drawn.'" *Id.* (alterations omitted) (quoting *Lieberman v. Gant*, 630 F.2d 60, 67 (2d Cir. 1980)).

"[A] profound inability to get along with [one's] coworkers . . . represents a legitimate, nondiscriminatory reason for an employment decision." *Ramos v. Marriott Int'l*, 134 F. Supp. 2d 328, 342 (S.D.N.Y. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 997 (2d Cir. 1985)); *see*

*also Jeffrey v. Montefiore Med. Ctr.*, No. 11-CV-64, 2013 WL 5434635, at *21 (S.D.N.Y. Sept. 27, 2013) (finding that the employer-defendant legitimately terminated the plaintiff for hostility to criticism, challenging authority and refusing to improve job performance); *Boata v. Pfizer, Inc.*, No. 10-CV-4390, 2013 WL 432585, at *5 (S.D.N.Y. Jan. 31, 2013) (finding that the plaintiff's inability to get along with others in the workplace was a legitimate, nondiscriminatory reason for terminating him); *Risco v. McHugh*, 868 F. Supp. 2d 75, 109 (S.D.N.Y. 2012) ("On the job misconduct and poor work performance always constitute legitimate and nondiscriminatory reasons." (alterations omitted)); *Jones v. Yonkers Pub. Schs.*, 326 F. Supp. 2d 536, 544 (S.D.N.Y. 2004) ("Getting along with one's co-workers is an essential component of satisfactory job performance.").

Here, Defendants articulate a legitimate, nondiscriminatory reason for transferring Plaintiff to Williamsburg. Between 2011 and 2012, patients routinely complained about Plaintiff's manner of speaking to them and his handling of the Dental Clinic. (Defs. 56.1 ¶¶ 17, 21–23, 28, 32, 35, 40.) Patients and Plaintiff's subordinates complained that Plaintiff was intimidating, dismissive and threatening. (*Id.* ¶¶ 17, 25, 39.) Clinical staff complained that Plaintiff was "not a team player," "would not listen" and was "creating a hostile work environment." (*Id.* ¶¶ 25–27, 41.) They also complained that Plaintiff was administratively interfering with direct patient care issues and overstepped his role. (*Id.* ¶¶ 17–18, 20–23.) Plaintiff's supervisor at Woodhull found him difficult to work with due to complaints about his conduct and his failure to submit reports on a timely basis. (*Id.* ¶¶ 16–17, 33, 101–04.) In May of 2013, after fourteen of Plaintiff's subordinates reported that Plaintiff bullied them and was rude, Mulvihill referred the matter to Human Resources. (*Id.* ¶ 111.) Plaintiff does not dispute that these complaints were made and that these events occurred; instead, he argues that his

colleagues and staff complained about him because he attempted to correct "regulatory violations" that are irrelevant to his FMLA retaliation claim. (Pl. Opp'n 15.)

Based on the undisputed facts, Defendants have made a sufficient showing to substantiate their decision to transfer Plaintiff to Williamsburg, and as discussed below, Plaintiff has not shown that Defendants' reasons were pretextual. *See Kim*, 862 F. Supp. at 320 (holding that a defendant "need only proffer some non-discriminatory reason for its actions. There is no need to assess the credibility of the proffered reasons and [the defendant] need not show that it actually relied on those reasons."); *Mattera v. JP Morgan Chase Corp.*, 740 F. Supp. 2d 561, 574 (S.D.N.Y. 2010) ("Defendants' burden at this stage is not to prove nondiscrimination. Instead, defendants must 'introduce evidence which, *taken as true*, would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action.'" (quoting *St. Mary's Honor Ctr.*, 509 U.S. at 509)); *see also Khan v. Bank of Am.*, 572 F. Supp. 2d 278, 291 (N.D.N.Y. 2008) ("A court may rely on supervisor evaluations as evidence of whether an employee met the employer's legitimate expectations.").

### iii. Plaintiff has not demonstrated that Defendants' proffered reasons were pretextual

Defendants argue that the record supports their legitimate reasons for transferring Plaintiff to Williamsburg, and Plaintiff's argument that those reasons were pretextual "rests solely on the temporal proximity between the exercise of his rights under the FMLA and his reassignment/termination." (Defs. Reply 5.) Plaintiff argues that the adverse employment actions "are temporally proximate enough to Plaintiff's protected activity to support a finding of pretext," and supports his argument of pretext by reference to the additional "hostility" he faced from Harper and Kavanagh "concerning his need to miss work for medical reasons." (Pl. Opp'n 15.)

The Second Circuit has held that "while the temporal proximity between [the plaintiff's] termination and [the protected activity] satisfies the causation element of [a] prima facie case, it is insufficient to create a question of fact as to whether [the defendant's] proffered non-retaliatory rationale for terminating [the plaintiff] was pretextual." *Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 89 (2d Cir. 2010); *see also Kwan*, 737 F.3d at 847 ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage." (citing *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010))); *Rodriguez v. Atria Sr. Living Grp., Inc.*, 887 F. Supp. 2d 503, 513 (S.D.N.Y. 2012) (citing *Ragusa*, 381 F. App'x at 89); *Brown v. The Pension Bds.*, 488 F. Supp. 2d 395, 410 (S.D.N.Y. 2007) ("Mere 'temporal proximity, standing alone, is insufficient to carry [the] plaintiff's burden at the [pretext analysis]." (second alteration in original) (quoting *Pellegrino v. County of Orange*, 313 F. Supp. 2d 303, 316 (S.D.N.Y. 2004))). "However, a plaintiff may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment . . . ." *Kwan*, 737 F.3d at 847; *Raniola v. Bratton*, 243 F.3d 610, 625 (2d Cir. 2001) ("Under some circumstances, retaliatory intent may . . . be shown, in conjunction with the plaintiff's prima facie case, by sufficient proof to rebut the employer's proffered reason for the termination."); *James v. N.Y. Racing Ass'n*, 233 F.3d 149, 156–57 (2d Cir. 2000) ("[E]vidence satisfying the minimal *McDonnell Douglas* prima facie case, coupled with evidence of falsity of the employer's explanation, may or may not be sufficient to sustain a finding of [retaliation]; . . . the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts [the] plaintiff must prove.").

A plaintiff pleading an FMLA retaliation claim must demonstrate that his employer "use[d] the taking of FMLA leave as a negative factor in employment actions." *See Woods*, --- F.3d at ---, 2017 WL 3044628, at *6 (quoting 29 C.F.R. 825.220(c)). A plaintiff may prove this "by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Kwan*, 737 F.3d at 846. From such discrepancies, "a reasonable juror could conclude that the explanations were a pretext for a prohibited reason." *Id.* (collecting cases).

Here, Defendants have shown a non-retaliatory rationale for transferring Plaintiff, and Plaintiff's reliance on the mere temporal proximity between his FMLA leave and his transfer cannot create genuine dispute of material fact about Defendants' stated reason for terminating him. As the Court explained with respect to Plaintiff's retaliation claim based on his termination, the additional evidence Plaintiff presents of Defendants' generalized hostility towards his medically necessary absences does not support an inference of retaliatory intent.

Plaintiff does not actually dispute the specific complaints made against him or errors in his performance, but only argues that, on the whole, his subordinates and superiors alike lodged complaints against him because they disliked his insistence that they comply with codes and regulations. (Pl. Opp'n 16 ("However, Plaintiff's supervisors and coworkers found him difficult to work with because Plaintiff frequently raised issues of regulatory compliance and forced other departments and his supervisors to address them.").) Even assuming Plaintiff's contentions are correct, Plaintiff's purported reporting of problems was not protected under the FMLA — that is, Defendants did not transfer Plaintiff for taking FMLA-protected leave; Defendants transferred Plaintiff because his colleagues, staff and patients complained about him. Given that the parties do not dispute that Plaintiff's supervisors found him "difficult" to work with and raised concerns

about his professionalism and performance, (*see* Defs. 56.1 ¶¶ 17–18, 20–23, 144–70), "it is not

for [the Court] to second-guess [Defendants'] standards of performance, absent affirmative

evidence — of which [Plaintiff] offers none — that [Defendants'] evaluation of [Plaintiff's]

performance was not in good faith," *Thomsen*, 483 F. App'x at 623; *see also Hale*, 219 F.3d at

66 (holding that where the "defendants articulated a nonpretexual reason for [the plaintiff's]

removal based on events which occurred prior to his going on leave," the plaintiff could not

sustain an FMLA claim because the FMLA "gives no greater job security than that to which the

employee would have been entitled prior to taking leave"); *Dister v. Cont'l Grp., Inc.*, 859 F.2d

1108, 1116 (2d Cir. 1988) (noting that "it is not the function of a fact-finder to second-guess

business decisions or to question a corporation's means to achieve a legitimate goal," and that

the "reasons tendered" by the company "need not be well-advised, but merely truthful").

Accordingly, on this record, no reasonable jury could find that Plaintiff has demonstrated

that Defendants' proffered reasons for his transfer were pretexual and that the real reason

Defendants transferred Plaintiff was in retaliation for his taking FMLA leave.  Because Plaintiff

has not made out a prima facie case of retaliation as to his termination in December of 2013 and

has not demonstrated that Defendants' reasons for his transfer to Williamsburg in May of 2013

were pretexual, the Court grants Defendants' motion for summary judgment on Plaintiff's

FMLA retaliation claim.

### c.   State law claims

Plaintiff also alleges that Defendants violated sections 740 and 741 of the New York

Labor Law, which provide causes of action for employee-whistleblowers.  (Compl. ¶¶ 54–77.)

A district court may decline to exercise supplemental jurisdiction over a claim if "the

district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C.

§ 1367(c)(3); *All. of Auto. Mfrs., Inc. v. Currey*, 610 F. App'x 10, 14 (2d Cir. 2015) (holding that it was "not improper for the court to decline to exercise its supplemental jurisdiction" after it properly dismissed the plaintiff's constitutional claims); *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." (alteration in original) (quoting *Castellano v. Bd. of Trs.*, 937 F.3d 752, 758 (2d Cir. 1991))).

Having dismissed Plaintiff's FMLA claim, the Court declines to exercise supplemental jurisdiction over Plaintiff's New York Labor Law claims. Plaintiff's New York Labor Law claims are dismissed without prejudice.

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: August 8, 2017
Brooklyn, New York